UNITED STATES of America,
Plaintiff–Appellee,

v.

William R. HOOKS,
Defendant–Appellant.

No. 87–1007.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 11, 1987.

Decided June 8, 1988.

Michael A. Pedicone, Michael A. Pedicone, Ltd., Chicago, Ill., for defendant-appellant.

Therese Cesar Garza, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD and POSNER, Circuit Judges, and GRANT, Senior District Judge.[*]

GRANT, Senior District Judge.

William Hooks appeals his conviction by a jury of conspiring to defraud the United States in violation of 18 U.S.C. § 371 and of aiding in the filing of a false estate tax return in violation of 26 U.S.C. § 7206(2). We affirm.

## I. *Facts*

This case concerns the unreported, untaxed assets of a decedent's estate. The underlying facts are not in dispute. Appellant Hooks' father-in-law, Floyd Loge, died in Evansville, Indiana, on September 26, 1978, leaving an $8 million estate. Loge's widow, Celia May Loge, and the Citizens National Bank of Evansville were co-executors under the will; the bank administered the estate.

Mrs. Loge and her daughter, Patricia Susan Hooks, turned over to the bank a box of stock certificates and bonds to be included in Loge's estate. When the bank asked Loge's personal broker to determine the market value of those assets, the broker discovered that he was not given ten issues of bearer bonds that had previously been a part of Loge's portfolio. The face value of those bonds was approximately $375,000.00.

The bank questioned Mrs. Loge about this discrepancy, and was told that the missing bonds could not be found. On the assurance that all of Floyd Loge's assets had been turned over, therefore, the bank prepared the federal estate tax return without including those ten bearer bonds in the estate. The return was filed on March 20, 1980.

In 1978, appellant William Hooks was a vice president of the Plasti–Drum Corporation. He asked his employer, Walter Craig, to store some bearer bonds in Craig's safe deposit box because he did not want anyone to know of his connection with the bonds. According to Craig, Hooks said that "the girls" (Mrs. Loge and Patricia Hooks) told Hooks to take the bonds from under Mr. Loge's bed. When Hooks and Craig went to the bank to put the bonds in Craig's box, they chatted with the loan officer of the bank, Patrick Richter. Hooks showed Richter the bonds. Richter told him he could convert the bonds to cash; Hooks responded that the cashing of the bonds would have to be done in such a manner that it could not be connected or traced to him.

Craig placed the bonds in his safe deposit box on October 31, 1978, and removed them, at Hooks' request, on December 1, 1978. Hooks then handed the bonds to Richter and told him to proceed with their plan for cashing them.

Richter approached bond broker Harold Finley with seven bond issues to be negotiated, and asked whether the bond proceeds could be paid by check payable to bearer or to cash. Both Finley and his office manager answered that, because the IRS required records of such transactions, payment had to be made by check to the owner of the bonds. Richter responded, "Well, we are trying to keep them out of a ten million dollar estate."

---

[*] The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

Although Finley refused to sell the bonds under those conditions, Richter eventually did sell them through Paul Gantzert, a trust officer of Union National Bank in Joliet, Illinois. All the bonds were cashed between December 1978 and March 1979. The proceeds of the bond sales were transmitted payable to the Union National Bank; Gantzert then issued checks and money orders to Richter and others. One money order for $45,000 was made payable to Green Bay Aviation Corporation as a down payment on the purchase of a corporate airplane for Plasti–Drum. The proceeds were also used to set up a new bank account and to purchase such items as two pieces of art by Chagall and a condominium.

It is undisputed that the bonds given to Richter for sale by Hooks were the ones missing from Loge's estate, and that their value was not included in that estate or reported on the estate tax return. As a result, $96,564.58 in estate tax was avoided.

Although the government considered Mrs. Loge and Mrs. Hooks to be unindicted co-conspirators who were a part of the plan to defraud the government, Hooks and Richter were the only members of the conspiracy who were indicted. The trial began August 26, 1986, and lasted thirteen days. On September 15, 1986, a jury found Hooks and Richter[1] guilty of conspiracy to defraud the government (18 U.S.C. § 371) and of aiding in the preparation of a materially false federal estate tax return (26 U.S.C. § 7206(2)).[2]

Hooks has appealed, contending that (1) the evidence at trial was insufficient to support either count of the conviction; (2) the court's admission of a co-conspirator's statement and exclusion of certain exculpatory hearsay statements were an abuse of its discretion; and (3) the prosecutor's refusal to offer immunity to defense witnesses denied him due process of law. For the reasons presented below, we affirm.

1. Co-defendant Patrick Richter does not appeal his conviction.

2. The court sentenced Hooks to eighteen months in the custody of the Attorney General

## II. *Sufficiency of the Evidence*

### A. 26 U.S.C. § 7206(2): "Aiding and Abetting"

Section 7206(2) of the Internal Revenue Code imposes criminal sanctions against one who

willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document.

26 U.S.C. § 7206(2).

Appellant Hooks asserts that the government's proof showed only that he concealed and cashed the bonds, and not that he aided or assisted in the filing of a false tax return. Claiming that this prosecution involved a "rare and novel application" of 26 U.S.C. § 7206(2), Hooks insists that one who is not the taxpayer, tax preparer, or supplier of information for the return cannot be charged with aiding and abetting a false estate tax filing.

The appellate standard used to determine whether a jury verdict rests on sufficient evidence is well established. If the reviewing court, considering all the evidence in the light most favorable to the prosecution, finds that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," it must affirm the conviction. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Marrinson*, 832 F.2d 1465, 1469 (7th Cir. 1987); *United States v. Conley*, 826 F.2d 551, 556 (7th Cir.1987).

The essential elements of an offense under section 7206(2) are (1) that defendant

and fined him $5,000 on the conspiracy count. It placed him on probation for five years following his imprisonment and fined him $5,000 on the aiding and abetting charge.

aided, assisted, procured, counseled, advised or caused the preparation and presentation of a return; (2) that the return was fraudulent or false as to a material matter; and (3) that the act of the defendant was willful. *United States v. Dahlstrom*, 713 F.2d 1423, 1426–27 (9th Cir.1983), *cert. denied*, 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed. 2d 835 (1984). *See also United States v. Kouba*, 822 F.2d 768, 773 (8th Cir.1987); *United States v. Crooks*, 804 F.2d 1441, 1448 (9th Cir.1986); *United States v. Perez*, 565 F.2d 1227, 1233–34 (2nd Cir.1977); *United States v. LaHaye*, 548 F.2d 474, 475 (3d Cir.1977). No challenge to the second criterion has been raised.

To establish the first element of the offense, aiding and abetting the filing of a false tax return, "there must exist some affirmative participation which at least encourages the perpetrator." *United States v. Graham*, 758 F.2d 879, 885 (3d Cir.1985), *cert. denied*, 474 U.S. 901, 106 S.Ct. 226, 88 L.Ed.2d 226 (1985), quoting *United States v. Buttorff*, 572 F.2d 619, 623 (8th Cir.), *cert. denied*, 437 U.S. 906, 98 S.Ct. 3095, 57 L.Ed.2d 1136 (1978).

It is well engrained in the law that one who aids or abets the commission of an act is as responsible for that act as if he committed it directly. *Nye & Nissen v. United States*, 336 U.S. 613, 618, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949).

> In order to aid and abet another to commit a crime it is necessary that a defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." L. Hand, J., in *United States v. Peoni*, 100 F.2d 401, 402 [2nd Cir. (1938)].

*Id.* at 619, 69 S.Ct. at 769–70.

The government showed that Hooks engaged in affirmative participation to make the common goal successful: He both concealed and liquidated the bearer bonds which were purportedly assets of the Loge estate. The evidence established that Hooks received from Celia Loge the ten bonds that should have been turned over to the tax preparer; that he hid those bonds in his employer's safe deposit box; and that he later cashed the bonds with the aid of his co-defendant Patrick Richter in such a way that they could not be traced back to him or to the estate. As a result, the estate did not include those bonds, Hooks and Richter were the beneficiaries of the proceeds from the bonds, and the Loge estate tax return, which did not report approximately $375,000 in assets, was false.

█ It is true that there was no direct evidence tying Hooks to the false tax return involved in the substantive count. Yet, as was the case in *Nye & Nissen*, there is circumstantial evidence wholly adequate to support the finding of the jury that he aided and abetted in the commission of that offense. *Nye & Nissen*, 336 U.S. at 619, 69 S.Ct. at 769–70. Clearly the government has been defrauded within the meaning of Section 7206(2) when the scheme is calculated to defeat government collection of tax. *United States v. McGee*, 572 F.2d 1097, 1099 (5th Cir.1978), citing *United States v. Haimowitz*, 404 F.2d 38 (2d Cir.1968). The scheme herein to defraud the government included both the nondisclosure of estate assets, which resulted in the false tax return and loss of revenue to the United States, and the subsequent cashing of the secreted bonds, which resulted in a gain of revenue to Hooks and Richter. The evidence presented, and the reasonable inferences drawn therefrom, were sufficient for the jury to decide that the defendants' activities constituted aiding and abetting the filing of the false tax return.

To establish the third element of the offense under section 7206(2), the government must also prove that the defendant's act was willful. The Eighth Circuit has recently examined what constitutes a "willful act" under this provision in *United States v. Kouba*, 822 F.2d 768 (8th Cir. 1987):

> The Supreme Court has defined the term "willfuly" under § 7206 and related statutes to mean a voluntary intentional violation of a known legal duty. *United States v. Pomponio*, 429 U.S. 10, 12, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976). *See*

*also United States v. Pohlman,* 522 F.2d [974] at 977 [ (8th Cir.1975) ]. "Willful" requires "proof of a specific intent to do something which the law forbids; more than a showing of careless disregard for the truth is required." *United States v. Dahlstrom,* 713 F.2d at 1427; *see also United States v. Pohlman,* 522 F.2d at 976.

*Kouba,* 822 F.2d at 773. *See United States v. Foster,* 789 F.2d 457, 461 (7th Cir.), *cert. denied,* ⸺ U.S. ⸺, 107 S.Ct. 273, 93 L.Ed.2d 249 (1986). Therefore there must be sufficient evidence that Hooks knowingly concealed the bonds with the expectation that Mrs. Loge, by denying the existence of those hidden assets, could cause a false estate tax return to be filed. *See United States v. Williams,* 809 F.2d 1072, 1095 (5th Cir.), *cert. denied,* ⸺ U.S. ⸺, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987).

The court finds ample evidence from the record of the scheme to conceal the estate assets from the IRS. Hooks knew that the bonds had belonged to Loge; he intentionally hid them in a safe deposit box that was not his own; he deliberately made several unsuccessful attempts, through his co-defendant Richter, to cash the bonds without identifying himself or Loge; he succeeded in negotiating the bonds only after they were taken from Indiana to an Illinois bank, which disposed of the bonds without divulging the recipient of the proceeds and without disclosing the transactions to the tax preparer who would have included them in the estate. These activities were deliberate, willful efforts to keep the bonds out of the taxable estate of Floyd Loge. The evidence is clear support for the jury's finding of Hooks' willfulness on the aiding counts. *See United States v. Zimmerman,* 832 F.2d 454, 457 (8th Cir.1987).

Appellant Hooks makes essentially the same argument in a different light: He asserts that the aiding and abetting statute is intended to prosecute those who supply false information to the tax preparer, or those who are under a duty to provide information; therefore, the violation of section 7206(2) actually occurred when Celia Loge decided neither to turn over nor to report the bonds to the tax preparer as part of her husband's gross estate. Under this interpretation of the offense, Hooks' later concealment and liquidation of the bonds was subsequent to, rather than part of, the conspiracy to cause the filing of a false estate tax return and immaterial to that violation.

This theory is similar to the argument presented by the defendant in *United States v. Collazo,* 815 F.2d 1138 (7th Cir. 1987). Collazo had been convicted of aiding and abetting the unlawful possession of stolen checks. On appeal, he asserted, unsuccessfully, that the evidence of aiding and abetting was insufficient because it had demonstrated that he dealt with the checks only after the act of unlawful possession was completed. 815 F.2d at 1144. In both cases, however, the defendants were willing recipients of the illegally possessed evidence which had been passed to them by other conspirators, and the scheme was furthered by their subsequent actions. *See* 815 F.2d at 1144–45.

■ The Supreme Court has made clear that the crime of aiding in the fraudulent preparation of a tax return is "committed at the time the return is filed." *United States v. Habig,* 390 U.S. 222, 223, 88 S.Ct. 926, 927, 19 L.Ed.2d 1055 (1968). The fraudulent return for the Loge estate was filed March 20, 1980; the bonds were concealed and sold by March 1979.

■ Moreover, Hooks' attempt to narrow his own involvement to the mere liquidation of assets while Mrs. Loge actually conceptualized the scheme and performed the illegal act of assisting in the preparation of a false tax return must fail. There is substantial evidence in the record that establishes a common scheme to withhold the bonds from the tax preparer, whether the purpose for that nondisclosure and concealment was to obtain less estate tax liability or more personal profit. Hooks' deliberate concealment of the existence and sale of the bonds, the true owner of the bonds, the amount of the proceeds from the secret sales, and the recipient of those proceeds did in fact keep those amounts out of Loge's estate, thereby reducing the collec-

tion of tax revenue on that estate. Mrs. Loge and Mrs. Hooks furthered the scheme by denying the existence of the bonds when questioned about them. Together their efforts succeeded in evading the payment of federal estate tax. It is not significant that different fraudulent practices occurred at different periods. The circumvention of the federal taxation system by the presentation of false information about the estate assets and by the carefully manipulated selling of estate assets "were part and parcel of the same conspiracy as charged and proved." *Nye & Nissen v. United States,* 336 U.S. at 617, 69 S.Ct. at 769. The jury had sufficient evidence reasonably to conclude that Hooks had been a willful and knowing participant in criminal violation of section 7206(2). That is all the government had to prove. *See United States v. Solomon,* 825 F.2d 1292, 1298 (9th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 782, 98 L.Ed.2d 868 (1988).

■ The court finds the government's application of section 7206(2) in these circumstances to be appropriate rather than "rare and novel."[3] Section 7206(2) has a broad sweep, making all forms of willful assistance in preparing a false return an offense. *United States v. Shortt Accountancy Corp.,* 785 F.2d 1448, 1454 (9th Cir.), *cert. denied,* 478 U.S. 1007, 106 S.Ct. 3301, 92 L.Ed.2d 715 (1986), citing *United States v. Haynes,* 573 F.2d 236, 240 (5th Cir.),

*cert. denied,* 439 U.S. 850, 99 S.Ct. 154, 58 L.Ed.2d 153 (1978). One may be guilty of aiding the preparation or filing of a false return under § 7206(2) whether or not the tax preparer knew of such falsity or fraud. "[T]he scope of the statute extends to all participants of a scheme which results in the filing of a false return, whether or not those parties actually prepare it." *United States v. Siegel,* 472 F.Supp. 440, 444 (N.D. Ill.1979), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), citing *United States v. Crum,* 529 F.2d 1380, 1382 (9th Cir.1976); *United States v. Frazier,* 365 F.2d 316, 318 (6th Cir.1966), *cert. denied,* 386 U.S. 971, 87 S.Ct. 1164, 18 L.Ed.2d 133 (1967). *See United States v. Zimmerman,* 832 F.2d at 457. The evidence adduced by the government showed Hooks to be a knowing and willful participant in the scheme which resulted in the filing of a false return. The court thus holds that a reasonable jury could have found the essential elements of an offense under section 7206(2) beyond a reasonable doubt.

## B. 18 U.S.C. § 371: Conspiracy

The crime of conspiring to defraud the United States is set out in 18 U.S.C. § 371, which provides in pertinent part:

> If two or more persons conspire either to commit any offense against the United

---

**3.** To challenge appellant's assertion that the prosecution's application of section 7206(2) was "rare and novel," the government cited six aiding and abetting cases that found liability because of the defendant's concealing actions: *United States v. Johnson,* 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943); *United States v. Graham,* 758 F.2d 879 (3d Cir.), *cert. denied,* 474 U.S. 901, 106 S.Ct. 226, 88 L.Ed.2d 226 (1985); *United States v. Guthartz,* 573 F.2d 225 (5th Cir.), *cert. denied,* 439 U.S. 864, 99 S.Ct. 187, 58 L.Ed.2d 173 (1978); *United States v. Crum,* 529 F.2d 1380 (9th Cir.1976); *Baker v. United States,* 401 F.2d 958 (D.C.Cir.1968), *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970); *United States v. Frazier,* 365 F.2d 316, 318 (6th Cir.1966), *cert. denied,* 386 U.S. 971, 87 S.Ct. 1164, 18 L.Ed.2d 133 (1967). Hooks claims that some of the cases are inapposite because they involve prosecutions under 26 U.S.C. § 7201 rather than under section 7206. However, section 7206 is simply a lesser-included offense of section 7201, which has been described as "the

capstone of a system of sanctions which singly or in combination were calculated to induce prompt and forthright fulfilment of every duty under the income tax law." *Spies v. United States,* 317 U.S. 492, 497, 63 S.Ct. 364, 367, 87 L.Ed. 418 (1943). A charge is a lesser-included offense when "it is composed of fewer than all of the elements of the [greater] offense charged, and if all of its elements are elements of the [greater] offense charged." *United States v. Citron,* 783 F.2d 307, 312 (2d Cir.1986), citing *United States v. LoRusso,* 695 F.2d 45, 52 n. 3 (2d Cir.1982), *cert. denied,* 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983). Therefore, the cases listed by the government are not inappropriate simply because they fall under section 7201 rather than section 7206. Section 7201 proscribes willfully attempting in any manner to evade or defeat any tax imposed by the Internal Revenue Code. *Sansone v. United States,* 380 U.S. 343, 350, 85 S.Ct. 1004, 1009–10, 13 L.Ed.2d 882 (1965).

States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 371.

Appellant argues that the evidence was insufficient to show that he was a member of a conspiracy or that he had the specific intent to aid in the preparation of the false tax return.

Our standard of review remains the same as with the first issue. We will reverse a conviction for insufficient evidence only if no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789; *United States v. Collazo*, 815 F.2d at 1142, 1144. After a jury verdict in favor of the government, "[i]t is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Under this standard, therefore, the appellant has a heavy burden. *United States v. Peters*, 791 F.2d 1270, 1290 (7th Cir.), *cert. denied sub nom. Odoner v. United States*, — U.S. —, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986).

The government had the burden of proving at trial these elements in order to sustain a conviction for conspiracy under § 371:

(1) an agreement to accomplish an illegal objective against the United States;

(2) one or more overt acts in furtherance of the illegal purpose; and

(3) the intent to commit the substantive offense.

*United States v. Dahlstrom*, 713 F.2d at 1429, citing *United States v. Melchor–Lopez*, 627 F.2d 886 (9th Cir.1980).

The Supreme Court has broadly interpreted the scope of this statutory conspiracy "to defraud ... in any manner or for any purpose" to include any fraud that "reaches 'any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government.'" *Tanner v. United States*, — U.S. —, 107 S.Ct. 2739, 2751, 97 L.Ed.2d 90 (1987), quoting *Dennis v. United States*, 384 U.S. 855, 861, 86 S.Ct. 1840, 1844, 16 L.Ed.2d 973 (1966), quoting in turn *Haas v. Henkel*, 216 U.S. 462, 479, 30 S.Ct. 249, 253, 54 L.Ed. 569 (1910). In an earlier case, *Ingram v. United States*, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959), the Court had interpreted the third element of a section 371 offense. Evaluating a section 371 prosecution of conspiracy to evade taxes, the Court found that the government need not prove "that the conspirators were aware of the criminality of their objective," but it must show that they knew of the liability for federal taxes. "[C]onspiracy to commit a particular substantive offense cannot exist without *at least* the degree of criminal intent necessary for the substantive offense itself." 360 U.S. at 678; 79 S.Ct. at 1319.

The essence of the crime of conspiracy is a "combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *United States v. Herrera*, 757 F.2d 144, 149 (7th Cir.1985) (quoting *United States v. Mayo*, 721 F.2d 1084, 1088 (7th Cir.1983)). Because a conspiracy is by its nature secret, its existence and common purpose must often be proved by circumstantial evidence. "The government need not establish that there existed a formal agreement to conspire; circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct may serve as proof." *United States v. Redwine*, 715 F.2d 315, 320 (7th Cir.1983), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984). *See also United States v. Krasovich*, 819 F.2d 253, 255 (9th Cir.1987). Circumstantial evidence may include whether the defendant has a stake in the outcome of the conspiracy. *U.S. v. Collazo*, 815 F.2d at 1143, quoting *United States v. Xheka*, 704 F.2d 974, 988 (7th Cir.), *cert. denied*, 464

U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983). "Once the Government proves the existence of a conspiracy, the Government need only offer 'slight evidence' to prove that an individual was a member of the conspiracy." *United States v. Whaley*, 830 F.2d 1469, 1473 (7th Cir.1987), quoting *United States v. Castillo*, 814 F.2d 351, 353 (7th Cir.1987).

Hooks contends that the acts and conversations attributed to Hooks by witnesses and co-conspirators at trial were innocent on their face and did not support an inference of an agreement to defraud the United States. Since no witness testified to an agreement between Mrs. Loge and the appellant, he claims that there was no proof that Hooks joined a conspiracy.

■ This position finds no support in the evidence. Testimony at trial adduced that Mrs. Loge and Mrs. Hooks gave ten bearer bonds to the defendant rather than to the bank for inclusion in Floyd Loge's estate. After secreting the bonds in Walter Craig's safe deposit box, Hooks then turned them over to defendant Richter for liquidation in a manner intended to conceal their connection both with himself and with the Loge estate. Richter told bond broker Finley that he could not disclose the name of the bond owner because "they were trying to keep the bonds out of a ten million dollar estate."

This is clearly a "case where efforts at concealment would be reasonably explainable only in terms of motivation to evade taxation." *Ingram*, 360 U.S. at 679, 79 S.Ct. at 1320. It was a reasonable inference on the part of the jury that Hooks was the person who informed Richter that the bonds were part of an estate. It was also reasonable for the jury to believe that a common plan existed among Mrs. Loge and/or Mrs. Hooks (who gave Hooks the bonds and denied their existence when questioned by the bank), Hooks (who concealed the bonds and arranged for their secret sale) and Richter (who disposed of the bonds without revealing the identity of the present and past owners). And, finally, the jury could reasonably infer that Hooks had a financial interest and stake in the

successful outcome of the scheme. *See Collazo*, 815 F.2d at 1143. The evidence was ample to support the jury's finding that Hooks, in concert with the other conspirators, actively assisted in keeping the bonds out of the estate and thus untaxed, thereby defeating the lawful functions of the IRS in the ascertainment and collection of federal estate taxes. 18 U.S.C. § 371.

We conclude that there was substantial evidence of Hooks' knowing participation in a conspiracy to defraud the government in its efforts to collect estate taxes. There is no justification for reversing appellant's conviction under 18 U.S.C. § 371.

## III. *Admissibility of Evidence*

Appellant Hooks has presented two contentions of error concerning the admissibility of evidence at trial: the admission of a hearsay statement by Hooks' co-defendant and co-conspirator; and the exclusion of the exculpatory written statements of unindicted co-conspirators Celia May Loge and Patricia Hooks.

It is well settled in this circuit that the trial judge has broad discretion concerning the admissibility of evidence, and that a reviewing court gives special deference to the evidentiary rulings of the trial court. *United States v. Kaden*, 819 F.2d 813, 818 (7th Cir.1987). Accordingly, this appellate court will neither substitute its judgment nor reverse the decision below absent a showing that the trial court abused its discretion. *United States v. Conley*, 826 F.2d 551, 559 (7th Cir.1987), citing *United States v. Buishas*, 791 F.2d 1310, 1313 (7th Cir.1986); *United States v. Harris*, 761 F.2d 394, 398 (7th Cir.1985).

### A. Co-conspirator Exception to the Hearsay Rule

Hooks asserts that it was error for the district court to have permitted the following hearsay testimony of Harold Finley, the broker to whom defendant Patrick Richter first took the bearer bonds to be cashed:

> FINLEY (direct): ... [E]ven on a small amount of money we have to know who

we are giving the check to and not just have a check payable to cash or bearer.

I know Patrick said, "Isn't there some way we could word this where there would not be any person's name on it but where the check could be immediately cashed?"

I was firm that whether it said cash or bearer or whatever, you just couldn't do it that way.

. . .

I said, "Can't"—"Is there some reason we can't make these bonds payable to the owner if you are not the owner?"

And he didn't seem to want to tell me who—what the situation was, but after a little—he was pretty unhappy that we couldn't just do it in the way of payable to cash or bearer. And then he did ultimately make the remark, *"Well, we are trying to keep them out of a ten million dollar estate,"* but didn't give me any clue whatsoever as to whose estate it was or what the connection between him and the estate.

.    .    .    .    .

Trial transcript at 726–28 (emphasis added).

Under Federal Rule of Evidence 801(d)(2)(E),[4] the co-conspirator exception to the hearsay rule, a statement made by a member of the conspiracy is admissible against other members of the conspiracy if made "during the course of and in furtherance of the conspiracy." The government must show (1) that a conspiracy existed; (2) that the defendant and declarant were members thereof; and (3) that the offered statement was made during the course of and in furtherance of the conspiracy. *United States v. Kaden,* 819 F.2d at 819; *United States v. Boucher,* 796 F.2d 972, 974 (7th Cir.1986); *United States v. Santiago,* 582 F.2d 1128, 1135 (7th Cir.1978).

In *United States v. Santiago, supra,* this circuit established that the admissibility determination concerning co-conspirator

hearsay must be shown by a preponderance of the evidence. 582 F.2d at 1134–35. The Supreme Court has recently explained the reason for holding an offering party to that standard of proof:

> We have traditionally required that these matters [admissibility determinations that hinge on preliminary factual questions] be established by a preponderance of proof. Evidence is placed before the jury when it satisfies the technical requirements of the evidentiary Rules, which embody certain legal and policy determinations. The inquiry made by a court concerned with these matters is not whether the proponent of the evidence wins or loses his case on the merits, but whether the evidentiary Rules have been satisfied. Thus, the evidentiary standard is unrelated to the burden of proof on the substantive issues, be it a criminal case or a civil case. The preponderance standard ensures that before admitting evidence, the court will have found it more likely than not that the technical issues and policy concerns addressed by the Federal Rules of Evidence have been afforded due consideration.

*Bourjaily v. United States,* —— U.S. ——, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987) (citations omitted).

A reviewing court will reverse the district court's findings with respect to these elements only if they are clearly erroneous. *Kaden,* 819 F.2d at 819, quoting *United States v. Williams,* 737 F.2d 594, 609 (7th Cir.1984), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).

The abovequoted testimony of Harold Finley contained the hearsay statement of co-defendant Richter at issue: "Well, we are trying to keep them out of a ten million dollar estate." Counsel for Hooks called a side bar and sought to exclude the declaration as to defendant Hooks. The district court judge noted that the government had already presented a *Santiago* proffer of

---

**4.** Rule 801 of the Federal Rules of Evidence, in pertinent part, provides:

(d) *Statements which are not hearsay.* A statement is not hearsay if—

(2) *Admission by party-opponent.* The statement is offered against a party and is ...

(E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

proof[5] of the existence of a conspiracy. Considering the *Santiago* factors, the court had found that a conspiracy existed, that both defendants were members of the conspiracy, and that the conversation sought to be excluded had been taking place during the course of the conspiracy. Accordingly, at the side bar the district judge concluded that the statements at issue were admissible against both defendants at that point in the trial, and that she would make a final determination of admissibility at the close of the government's case.

After the government rested and the jury was excused, the court allowed further argument from all parties regarding the court's conditional admission of hearsay co-conspirator statements under the *Santiago* proffer. The court then concluded that the statements were admissible:

> THE COURT: All right. Having heard all the evidence that the Government has presented, the Court in making this determination can look at both direct and circumstantial evidence to make a determination as to whether or not there exists a conspiracy and whether or not the defendants are a participant [sic] in the conspiracy and whether there's independent evidence to show that they are members of the conspiracy, and the Court finds that that has been met by the standards that should be applied by *Santiago*, which is by a preponderance of the evidence.
>
> The various conversations as outlined by the Government, the circumstantial evidence showing the cashing of the bonds, and the tracing of the proceeds of the bonds through various accounts presents [sic] sufficient evidence for the Court to so find under the standards as articulated under *Santiago*.

Trial Transcript at 1352.

■ The propriety of this manner of receiving co-conspirator statements into evidence has been approved by this circuit. *See United States v. Andrus,* 775 F.2d 825, 837 (7th Cir.1985). The government's preliminary proffer and the court's initial determination and later scrutiny sufficiently protect the defendant's rights under *Santiago*. *United States v. Shoffner,* 826 F.2d 619, 628–30 (7th Cir.), *cert. denied sub nom. Stange v. United States,* —— U.S. ——, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987); *Boucher,* 796 F.2d at 974–75.

*Santiago* required, and the trial court found, that evidence independent of the hearsay testimony show that a conspiracy existed and that the defendant was a member. That mandate for proof through independent facts was established by *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and affirmed in *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). In its recent decision, *Bourjaily v. United States,* however, the Supreme Court has eliminated that "independent evidence" test. —— U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). The Court pointed out that the Federal Rules of Evidence, enacted in 1975, now govern the treatment of evidentiary questions in federal courts. Rule 104, which "on its face allows the trial judge to consider any evidence whatsoever, bound only by the rules of privilege," prevails over previous evidentiary tests. 107 S.Ct. at 2780. On that basis the Court held "that a court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted." 107 S.Ct. at 2782.

■ This circuit has recognized the change in the foundation for the admission of hearsay under that rule. *See, e.g., United States v. Zambrana,* 841 F.2d 1320, 1343–47 (7th Cir.1988); *United States v. Van Daal Wyk,* 840 F.2d 494, 496 (7th Cir.1988); *United States v. Potts,* 840 F.2d 368, 371 (7th Cir.1987); *United States v. Garner,* 837 F.2d 1404, 1415 (7th Cir.1987). We therefore no longer require a showing of the conspiracy and of the defendant's

---

**5.** In *Santiago* this circuit, along with others, "recognized that the trial judge retains the option of conditionally admitting the co-conspirator declaration evidence before the conspiracy has been independently established, but subject to the subsequent fulfillment of that critical condition." *Santiago,* 582 F.2d at 1131.

membership in it by a preponderance of evidence independent of the hearsay statements. Under *Bourjaily,* a trial court may consider the content of the hearsay statement itself when determining the admissibility of the statement under Rule 801(d)(2)(E).

■ In this case, in which the trial judge followed the stricter *Santiago* test previously espoused by this circuit, the court properly considered evidence independent of the hearsay in finding that the government had established by a preponderance of the evidence that there was a conspiracy in which both the defendant Hooks and co-defendant Richter were involved. We conclude, after examination of the entire record, that the district court's factfinding was not clearly erroneous and hold that the out-of-court co-conspirator statements were properly admitted against defendant Hooks.

### B. Unavailable Declarant Exception to the Hearsay Rule

Hooks argues that the transcribed statements of Celia May Loge and Patricia Hooks, made to the prosecutor on August 6, 1985 in the presence of their attorney, were improperly barred from the trial by the district court. Because the statements would rebut the charges of an agreement between Mrs. Loge and Hooks and any intent to conspire, they were indispensable to Hooks' position that there was no conspiracy.

Hooks sought admission of the transcribed statements under Federal Rule 804(b)(5) of Evidence,[6] the catchall hearsay exception, contending that the statements were trustworthy and contained admissions

that were against the interest of the declarants. The trial court barred their admission into evidence on the grounds that the statements did not have sufficient indicia of reliability: They were not made under oath, were not made against interest, were not corroborated and were self-serving.

This court has recently reviewed the Rule 804(b)(5) hearsay exception in *United States v. Guinan,* 836 F.2d 350, 353–58 (7th Cir.1988). We noted that the criteria for Rule 804(b)(5) are stringent, *United States v. Boulahanis,* 677 F.2d 586, 588 (7th Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982), and that the "trial judge has a considerable discretion, within the parameters of the rules of evidence, in determining whether ... hearsay statements contain the necessary circumstantial guarantees of trustworthiness." 836 F.2d at 354, quoting *United States v. Vretta,* 790 F.2d 651, 659 (7th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 179, 93 L.Ed.2d 115 (1986) (citations omitted).

Out-of-court statements are generally inadmissible because they are presumed to be unreliable. The party wishing to introduce hearsay evidence must rebut that presumption of unreliability by appropriate proof of "trustworthiness." (*See* Fed.R. Evid. 803(24), 804(b)(5).) It is the task of the trial court "to evaluate these statements for their evidentiary worth as revealed by the particular circumstances of the case." *Bourjaily v. United States,* 107 S.Ct. at 2781.

The statement of an unavailable declarant is admissible under Rule 804(b)(5) only if it has the "equivalent circumstantial

---

**6.** Rule 804 of the Federal Rules of Evidence, in pertinent part, provides:

(b) *Hearsay exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(5) *Other exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the

proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opporunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

guarantees of trustworthiness" required under the other hearsay exceptions.

■ A declarant's statement is trustworthy when it is made under oath and subject to prosecution for perjury, is given without coercion, and is corroborated by other testimony or evidence. *Boulahanis*, 677 F.2d at 588. Another indicium of reliability is the declarant's disinterest; the testimony of a "mere bystander with no axe to grind" tends to be more trustworthy. *Boulahanis, supra.* Although these factors are neither necessary in themselves nor exhaustive as a list of prerequisites for admissibility of statements under Rule 804(b)(5), they offer valid guidelines for the determination of the trustworthiness of hearsay testimony. *Guinan*, at 355. *See, e.g., United States v. Howard*, 774 F.2d 838, 845–46 (7th Cir.1985). However, every case must be analyzed on its own facts.

■ In the case herein, virtually none of these factors is found. Mrs. Loge and Mrs. Hooks were certainly not mere bystanders. Their statements, in the face of possible indictment, were suspiciously self-serving. Following a recess for an examination of the transcript of the interview with Mrs. Loge and Mrs. Hooks, the court made the following findings:

In this instance the statement was not made under oath. There were no statements made against interest. It was not like a situation where we had a spontaneous utterance. We don't have a situation where there are corroborating facts that corroborate the statement that the witness made....

Here the court finds that the statements here were self-serving. Mrs. Loge, as well as Mrs. Hooks, were facing the possibility of indictment. The Court doesn't feel that there were any other facts that would substantiate the statements that were given and that what we have here is a witness coming into the prosecutor's office with a lawyer, giving a statement, and the Court doesn't feel that that is enough to warrant trustworthiness or the indicia of trustworthiness as required by the rule.

What I will allow you to do is make an offer of proof as to what Mr. Merryman [counsel for Mrs. Loge and Mrs. Hooks] would say so that you have a complete record. And I should further find in accordance with the rule that the Court finds it would not be in the interest of justice for those reasons I articulated to admit the statement under these conditions.

Tr. at 1920–21.

We agree with the district court's evaluation. The August 6, 1985 interview was held in the prosecutor's office at the end of a four-year investigation and prior to indictment. Mrs. Loge's responses were hesitant, brief, and frequently interrupted by Mrs. Hooks and her attorney. The written statement was actually typed notes made by an individual in the room; it was not a stenographic record of the interview. The prosecutor asserts that it differs significantly from their notes of the meeting. Considering the circumstances under which the unsworn testimony was given, it is more likely than not that Mrs. Loge and Mrs. Hooks had motive to testify falsely. No other factors in those circumstances rendered the statements reliable. The requisite indicia of trustworthiness not found, the court refused to admit the exculpatory self-serving statements.

In light of the court's analysis of the trustworthiness of the statements at issue and its consideration of the subsequent offers of proof by counsel for both defendants, we find that the parties were accorded a full and fair hearing of the admissibility of this hearsay testimony of the witnesses who were unavailable by virtue of their fifth amendment privilege. After reviewing the record and briefs submitted, we find that the appellant failed to rebut the presumption of unreliability by a "showing of particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 67, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980). We further find that the trial court's determination was not an abuse of its discretion, and therefore uphold its decision to exclude the hearsay testimony of Mrs. Loge and Mrs. Hooks.

## IV. *Defense Witness Immunity*

Counsel for Celia May Loge and Patricia Hooks appeared before the court, out of the presence of the jury, to notify the court that he had advised his clients to assert their fifth amendment privilege against self-incrimination; and, indeed, Mrs. Loge and Mrs. Hooks did refuse to testify on that ground when called to the stand. The trial court found that both witnesses had a good-faith basis for asserting their fifth amendment right, since they could be the subject of criminal prosecution. The court also found that there had been no showing of threats or intimidation by the government against the two women that had influenced their decision not to testify. When Hooks' attorney asked the government to immunize the witnesses, the prosecutor refused. When he then asked the court to confer immunity on the witnesses, the trial judge stated that the court was powerless to do so.

Appellant contends that the prosecution should have sought immunization for Mrs. Loge and Mrs. Hooks following their fifth amendment declaration. He claims that he was deprived of due process of law because the prosecutor and the court refused to grant immunity to these two defense witnesses while conferring immunity on prosecution witness Walter Craig in exchange for his cooperation with the government. According to the appellant, this improperly selective use of immunity distorted the judicial fact-finding process and thus was an abuse of the government's and the court's discretion.

A federal prosecutor's right to grant immunity to a witness is governed by statute. 18 U.S.C. §§ 6002, 6003.[7] *United States v. Taylor*, 728 F.2d 930, 934 (7th Cir.1984), *cert. denied*, — U.S. —, 107 S.Ct. 933, 93 L.Ed.2d 983 (1987). The validity of the statute has been upheld by the Supreme Court. *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). It is clear from the language of section 6003 that Congress has delegated the authority to grant "use immunity" solely to the executive branch of government. *Taylor*, 728 F.2d at 934. Furthermore, that section provides considerable discretion to the prosecutor, who is permitted to request immunity when "in his judgment" it is "necessary to the public interest." It is the duty of the prosecutor to "balance 'the public need for the particular testimony or documentary information in question against the social cost of granting immunity and thereby precluding the possibility of criminally prosecuting an individual who has violated the criminal law.' " *Id.*, quot-

---

7. 18 U.S.C. § 6002 provides:

Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to

(1) a court or grand jury of the United States,

(2) an agency of the United States, or

(3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House,

and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

18 U.S.C. § 6003 provides:

(a) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States or a grand jury of the United States, the United States district court for the judicial district in which the proceeding is or may be held shall issue, in accordance with subsection (b) of this section, upon request of the United States attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

(b) A United States attorney may, with the approval of the Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General, request an order under subsection (a) of this section when in his judgment

(1) the testimony or other information from such individual may be necessary to the public interest; and

(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

ing *In re Daley,* 549 F.2d 469, 478–79 (7th Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977). The statute does not obligate the government to grant defense witness immunity. *United States v. Heldt,* 668 F.2d 1238, 1282 (D.C.Cir.1981), *cert. denied sub nom. Hubbard v. United States,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982).

The trial court lacks authority to provide immunity for a defense witness absent a request by the government. *Heldt,* 668 F.2d at 1282 (citing cases from other circuits). Indeed, the court is powerless to direct the government to seek immunity for a defense witness who exercises his fifth amendment privilege against self-incrimination. *United States v. Frans,* 697 F.2d 188, 191 (7th Cir.), *cert. denied,* 464 U.S. 828, 104 S.Ct. 104, 78 L.Ed.2d 107 (1983). The Second Circuit has characterized the deference to be paid by the court to the prosecution's refusal to grant use immunity to a witness:

> [W]e think trial judges should summarily reject claims for defense witness immunity whenever the witness for whom immunity is sought is an actual or potential target of prosecution. No hearing should be held to establish such status. The prosecutor need only show that the witness has been indicted or present to the court *in camera* an *ex parte* affidavit setting forth the circumstances that support the prosecutor's suspicion of the witness's criminal activity.

*United States v. Turkish,* 623 F.2d 769, 778 (2d Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981).

Nevertheless, the prosecutor's power to seek or to refuse to seek immunity is limited by the constitutional right to due process of the law. Accordingly, this appellate court "will not review a prosecutor's immunization decisions in the absence of substantial evidence showing that the prosecutor's actions amounted to a clear abuse of discretion violating the due process clause." *Taylor,* 728 F.2d at 935, quoting *United States v. Wilson,* 715 F.2d 1164, 1173 (7th Cir.), *cert. denied,* 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983).

The prosecutor has abused his discretion when he intends to use his authority to distort the judicial fact-finding process. *Frans,* 697 F.2d at 191.

The appellant asserts that the prosecutor, aware of the exculpatory nature of the testimony of Mrs. Loge and Mrs. Hooks and its inconsistency with the government's circumstantial evidence, kept their evidence from the jury by not offering them immunity. In order further to accomplish this plan, Hooks suggests, the government threatened possible prosecution of the two women for perjury and false statement, thereby intimidating them sufficiently to deter them from testifying.

We will consider first the allegation of threats by the government.

A fundamental element of due process of law is the right of an accused to present witnesses in his own defense. *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *Burrus v. Young,* 808 F.2d 578, 581 (7th Cir.1986). Those witnesses must be "free to testify without fear of governmental retaliation." *United States v. Blackwell,* 694 F.2d 1325, 1334 (D.C.Cir.1982). *See United States v. Goodwin,* 625 F.2d 693, 703 (5th Cir.1980).

> It is not improper *per se* for a trial court judge or prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely. But warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify.

*Blackwell,* 694 F.2d at 1334.

Three cases clearly illustrate the infringement of a defendant's due process rights by threats and warnings made to a defense witness. In *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), a witness refused to testify for the defendant after the trial judge gratuitously singled him out for a lengthy admonition of the dangers and dire consequences of perjury. In *United States v. Morrison,* 535 F.2d 223 (3d Cir.1976), the defense witness asserted her fifth amendment rights because the prosecutor had sent her repeated warnings of her liability to prosecution and

had held an intimidating personal interview with her. And in *United States v. Heller*, 830 F.2d 150 (11th Cir.1987), the defendant had been deprived of an important defense witness by the threats and interference of I.R.S. agents who forced the witness accountant to testify falsely against the defendant. In all three cases, the conduct of the government or the court was responsible for the defendant's deprivation of the right to present witnesses on his behalf.

The Fifth Circuit has recently examined in detail the issue of prosecutorial intimidation of a defense witness in *United States v. Viera*, 839 F.2d 1113 (5th Cir. 1988). When the trial commenced, the father of the defendant, Gaspar Viera, was sworn in as a defense witness. However, the prosecutor disclosed that he had evidence implicating Gaspar Viera in several drug transactions with his son Anthony. The court described the prosecutor's subsequent comments thus:

> Therefore, asserted the prosecutor, should the elder Viera choose to testify, he would likely be forced either to incriminate himself by admitting involvement in these crimes or to commit perjury by denying his involvement. Either way, the prosecutor said he would seek an indictment of Gaspar Viera before a grand jury convening the next week.

*United States v. Viera*, 819 F.2d 498, 500 (5th Cir.1987).

Defendant's attorney decided not to call Gaspar Viera to testify, but objected to the prosecutor's conduct and moved for a mistrial. The court denied the motion for mistrial, but noted that the prosecutor's statements were in poor taste. Before resting his case, defense counsel told the court that he did not call Viera's father to testify because the prosecutor had publicly stated that he would indict the witness. The prosecutor responded that he had simply informed counsel that the father's possible complicity in drug dealing might pose problems for the defendant and the witness if the father were to testify. The court stated that such information did not hinder the defense from calling the father as a witness.

The Fifth Circuit originally found "that the prosecuting attorney impermissibly infringed on appellant's right to present witnesses on his behalf[;] and because no immediate curative instruction was issued by the trial court following the prosecutor's improper comments, we reverse appellant's conviction." 819 F.2d at 502.

When the case was reheard en banc, however, the full panel reversed that decision. The majority, eleven of the fifteen circuit judges, gave two reasons for finding no violation of the appellant's constitutional right to present testimony on his own behalf. The first was the lack of evidence to show that the prosecutor's intimidation had caused Gaspar Viera not to testify.

> No claim was made that the father was influenced by this expression of the prosecutor or that the father did not wish to testify. No request was made to the court to inquire further into the matter or to hold a hearing or to consider any harm or prejudice to the defendant. We find here neither error by the court nor showing of prejudice to the defendant.

839 F.2d at 1115.

The second was the court's determination that the prosecutor's actions did not impermissibly prejudice the defendant. A statement by the prosecutor, attached to his brief, explained his conduct to the court:

> "I felt that the Government's attorney had an ethical duty to advise defense counsel that it was possible that if the father was called as a witness and provided incriminating evidence against himself, or perjury [sic], that I would take the matter to the next setting [sic] Grand Jury, the following week, and present the matter to them for their consideration and that he could be indicted. This information was not intended as a 'threat' but communicated in good faith with honorable motives."

*Id.* The court found no fault in that justification and upheld his conduct.

> We fail to seek the vice in this statement. A prosecutor is always entitled to attempt to avert perjury and to punish criminal conduct. *See United States v. Binker*, 795 F.2d 1218, 1229 (5th Cir. 1986); *United States v. Whittington*,

783 F.2d 1210, 1219 (5th Cir.1986). By adding that he would move promptly to present any violation to the Grand Jury, the prosecutor cannot be charged with harassment, particularly when the statement was made to defense counsel rather than to a prospective lay witness. No showing has been made that a prospective witness was intimidated or that he refused to testify. *See United States v. Blackwell,* 694 F.2d 1325, 1343 (D.C.Cir. 1982). Nor is there any suggestion in anything that is before us that the father's testimony would have contained any material exculpatory evidence to aid Viera's defense.

*Id.*

Over a vigorous dissent by four circuit judges, the Fifth Circuit affirmed the defendant's conviction.

We now examine the circumstances of this case to determine whether the prosecutor improperly threatened or warned the witnesses.

The transcript reflects that the prosecutor did state to the court and counsel for witnesses that Mrs. Loge and Mrs. Hooks could possibly be prosecuted for perjury and false statements. However, it was clear that the possibility was unlikely, particularly for Mrs. Loge, whose age and health were significant factors being considered by the government. In spite of the attempts by defendant's counsel to prove that the government was intimidating the women by threatening prosecution, the attorney representing both women made clear that their decision not to testify was entirely their own, upon his advice.[8] The

---

**8.** Proceedings out of the presence and hearing of the jury were held on September 10, 1986 to discuss the witnesses' refusal to testify. Present were the Honorable Ann C. Williams, Ms. Thomas and Mr. Stetler for the Government, and Mr. Pedicone and Mr. Carbonaro for the defendant Hooks. The following portion of the transcript reflects the position by defense counsel that Mrs. Loge and Mrs. Hooks were intimidated by the government into refusing to testify.

MR. PEDICONE: So the Government can effectively preclude any witness that the defense intends to produce and to exercise its Sixth Amendment rights to confront witnesses and utilize compulsory process by making a threat or representation that they may prosecute any witness the defendant wants to put up there as long as they've testified or been interviewed by a Government witness.

Any witness that's been interviewed by a Government witness could always be given the threat that they may be prosecuted for false statements. They all take the Fifth. The defendant never gets to introduce any evidence in his own behalf.

THE COURT: Well, you can characterize it the way you want, Mr. Pedicone, but it was Mrs. Loge's attorney who indicated that they would be taking the Fifth because of potential liability.

MR. CARBONARO: Because they were warned by the Government.

MR. PEDICONE: I'd like to flow [sic] when the conversation was.

MR. CARBONARO: When did that conversation take place between you and the Government.

MR. MERRYMAN: If you're referring to the one I just mentioned—

MR. CARBONARO: Yes.

MR. MERRYMAN: —I have only spoken to—I spoke to Miss Thomas last night and I spoke

to her again in the hall today. I think she got—I raised the issue myself when I spoke to her last night that I was going to take the Fifth.

I told Mr. Pedicone as a matter of fact I was going to take the Fifth before I talked to Miss Thomas.

She merely discussed with me a couple of the possible liabilities that the Government might still be able to assert, and that was this morning in the hall.

MR. PEDICONE: So she reinforced today or yesterday she reinforced your concern that there might be Fifth Amendment questions of your client?

MR. MERRYMAN: Well, I wouldn't say she reinforced it. It was obvious to me, and she detailed some of the—

MR. PEDICONE: There was a statement when you first addressed the Court that you had spoken with the Government and there was talk about some potential liability.

MR. MERRYMAN: Yes.

MR. PEDICONE: When was that conversation?

MR. MERRYMAN: That would be in the conversation that I initiated with her last night by telephone and in the conversation today.

MR. PEDICONE: Prior to that conversation had you had any such conversation?

MR. MERRYMAN: Prior to that I've had no conversation with anybody to my knowledge in about a year in this case. So it just all came before me in the last 48 hours.

THE COURT: After the subpoena was served.

MS. THOMAS: We just found out yesterday that they were even going to be witnesses, Judge.

MR. PEDICONE: Judge, I think you have to construe these indications from the Government that there may be repercussions to the

court made a specific finding that there was no evidence of threats or intimidation.

The circumstances herein in no way resemble those found in *Webb* or *Morrison.* Counsel for Mrs. Loge and Mrs. Hooks told the court that he advised his clients to invoke their fifth amendment privilege. It is clear that the government was not responsible for their decision. Nor did the prosecutor state that he would indict the witnesses if they testified, as occurred in *Viera.* Neither the appellant nor the court refers to any other actions reflecting misconduct or bad faith on the part of the prosecutor. We have found no government interference with the defense witnesses' choice not to testify. Indeed, we find the allegation by Hooks totally without merit.

We turn now to appellant's contention that the government's withholding of immunity distorted the fact-finding process by keeping their exculpatory evidence from the jury.

When counsel for defendant Hooks requested immunity for Mrs. Loge and Mrs. Hooks, the prosecutor responded that it did not intend to offer immunity to them because it was not "in the best interest of justice." The government has broad discretion in its grants of immunity. It is the prerogative of the Attorney General and his designees to determine whether a grant of immunity is "in the public interest" under 18 U.S.C. § 6003. *In re Perlin,* 589 F.2d 260, 269 (7th Cir.1978). The district court's function in this regard is largely ministerial; it does not have the discretion to consider the public interest. *Id.*

■ The prosecutor herein mentioned certain statements made by the two women that the government knew or believed to be false. It is well within the discretion of a prosecutor under 18 U.S.C. § 6003 to decline immunity to a witness who could be charged for false statement and perjury. *See Taylor,* 728 F.2d at 935 (prosecutor acted within his discretion in revoking the immunity of a witness whose prior testimony had been discovered to be false). Indeed, it is his prerogative to decide not to seek immunity simply because the government would gain nothing and the immunity would hinder future actions. *Frans,* 697 F.2d at 191.

■ This circuit requires a defendant to make a substantial evidentiary showing that the government intended to distort the judicial fact-finding process before we will depart from the strong tradition of deference to prosecutorial discretion. *Id. See United States v. Herman,* 589 F.2d 1191, 1203–04 (3d Cir.1978), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979). The appellant herein, unable to present even minimal evidence of actions by the government that distorted the fact-finding process, has not met his burden of proving the prosecutor's abuse of discretion.

Also without merit is appellant's assertion that the prosecutor's granting of immunity to Walter Craig while refusing to grant it to Mrs. Loge and Mrs. Hooks was a violation of the appellant's due process rights. "[A] trial is not a 'symmetrical proceeding' which requires a court to grant the defendant's witnesses immunity because the government uses immunized witnesses." *United States v. Thevis,* 665 F.2d 616, 641 n. 28 (5th Cir.), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982), citing *United States v. Turkish,* 623 F.2d 769, 774–75 (2d Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981). We do not find that the government's selective grants of immunity have produced "egregiously lopsided access to

witness that are occurring only after the issuance and service of the subpoena on these witnesses in the context of our argument.

It appears to be an attempt by the Government to intimidate these witnesses from testifying.

THE COURT: That's not how the Court reads it.

MR. PEDICONE: That's how the defendant is arguing it.

THE COURT: I understand. And as I said before, you can characterize it the way you want. That is not the Court's view of it.

As far as I can tell, Mr. Merryman has indicated a good faith basis for them asserting the Fifth Amendment. That's all this Court is required to review, whether or not there's a good faith basis for asserting the Fifth Amendment privilege.

Trial Transcript at 1883–86.

evidence." *United States v. Buljubasic,* 808 F.2d 1260, 1268 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987).

■■■ Hooks' assertion that the court abused its discretion by not granting the immunity is equally without merit. The court itself is powerless to grant immunity and is obligated to defer to the immunization decision of the prosecutor unless the prosecutor's conduct exceeds the bounds of the due process clause. *Taylor,* 728 F.2d at 935. After hearing argument by all counsel concerning the prosecutor's alleged intimidation, possible charges against the witnesses, and reasons for the prosecutor's decision not to immunize the witnesses, the court found that the government's refusal to grant immunity was proper. The court in no way abused its discretion in this determination.

### V. *Conclusion*

Based on a thorough review of the record and reviewing the evidence in the light most favorable to the prosecution, we hold that any rational trier of fact could have found beyond a reasonable doubt the elements of the offenses of 26 U.S.C. § 7206(2) and 18 U.S.C. § 371. We further hold that the trial court did not abuse its discretion in admitting the hearsay statements of co-conspirator Patrick Richter and in excluding the unsworn self-serving testimony of Mrs. Loge and Mrs. Hooks. Finally, we hold that the defendant failed to present substantial evidence showing that the conduct of either the prosecutor or the court in refusing to grant immunity amounted to a clear abuse of discretion. The appellant's constitutional guarantee of due process has not been violated by the government's denial of immunity to two defense witnesses. Accordingly, we affirm the conviction of the appellant.